May it please the Court, my name is Neal Hammond and I represent the Parsons in this claim against the defendant insurers. This is a health insurance reimbursement claim and this appeal is up from the District Courts. Counsel, it looks to me as though there are a lot of issues that are in the briefs that need not be decided and that all that really matters is, is it an experimental proceeding? Because the insurance contract excludes coverage for experimental proceedings. If it is, then no coverage. If it isn't, then coverage. Yes. Is that right? That's absolutely correct, Your Honor. Now, it looks to me as though the doctor told the patient on the consent form, this is an experimental proceeding, it's not tested, it's not approved for general use and you may die if I do it. On the other hand, he told the insurance company this is an established proceeding. Gosh, how do you, I don't, I read the briefs and I don't see how you get around to being an experimental proceeding. It looks like, it may be a great idea and it would be wonderful to get a remedy for this horrible disease, but it looks as though it's just this doctor's idea, it's an exciting idea, it's only been tried on a very few people. The FDA has not yet approved it for general use and the doctor himself says it's an experimental proceeding that needs more testing. How do you get around that? Your Honor, there are several ways to get around that because the facts don't say what you just recited. Number one, this informed consent was an informed consent written approximately ten years prior to the time this patient signed the informed consent. It was written at a time when no patient had been treated. But it's still the form that the doctor made the patient sign. I mean, he's telling the patient, you die or get permanently disabled, no lawsuits against me, because we already know it's not the general standard of medical care. And then he's telling the insurance company, it is the general standard of medical care, you've got to pay me. He never said it was not the general standard of medical care. He said it was the only standard for a patient that had failed all standard therapy. And if you look at the plan, which is what I would like to draw your attention to. I'm looking at the consent form right now and it says it's research, it says it's experimental, it stresses that it's experimental, it says it may cause serious or life-threatening infections, that Crohn's disease patients are prone to infections from the bacteria in the gut, that it may be life-threatening or result in death as one of the side effects. It doesn't say anything about... Your Honor, can I... It may be no benefit to you from your participation. It's a research, and he says this research study is risky of no proven benefit and may not work. Of no proven benefit means of no proven benefit. Your Honor, can I just respond to the informed consent with this comment? We're looking at a plan that specified how experimental and investigational was to be defined. In that definition, informed consent and clinical trials is nowhere to be found. All right, let me get to the five parts that are to be found. Yes. And one is about peer-reviewed medical literature does not permit conclusions concerning its effect on health outcomes. What are the peer-reviewed medical... What peer-reviewed medical literature should we be looking at? Those are cited in the briefing. Number one, the blood article that included patients that had been treated at the time that these decisions that we're contesting were made. At the time these decisions were contested... Okay, wait, wait. I want to find out what they are. One, the blood article, and two, there's an article by 12 people, including the doctor. That's correct. Are there others, or are those the two? Those are the one in blood and the one in gastroenterology. Those are the ones I cited and that you have. Well, the one in, I've got to say, frankly, the one in blood I couldn't read from the record. Maybe it's my eyesight. I couldn't either. It's a poor copy. Can I just... Let me go to the other one for a moment, the one that's signed by the 12 doctors, including the doctor here. As I read that, it says something that's not very helpful. It said that it worked, but it said it still needs verification and it still needs confirmation before they can express a conclusion. Yes. Your Honor, can I speak to that? Yes. Specifically, what it said was that a randomized trial to set that as the standard of care would be necessary, which Dr. Burt did over the years. He got that through his review board at the University of Chicago. He set that up, and no one would do it. The reason they wouldn't... Can I ask you just one question? I want to understand the context of this discussion. As I understand it, what we're talking about is the term in the plan entitled experimental and investigational. The treatments are defined as follows. There are five parts. That's correct. But it's or. Each one of them has to be satisfied. They are disjunctive. Okay. So the fact that they're disjunctive means that even if, for example, there were peer-reviewed literature, if it had not received final approval of the market from appropriate governmental bodies, it would still be an experimental and investigational treatment under the definition of the plan. Is that correct? Would you repeat the question? Yeah. Point one is just about the same. I started with point two. I was then going to go to point one. If you flunk either two or one... Or three or four or five. I was going to do two and one, which seemed to me your greatest problems. But they're all problems. One is that you have to have the peer-reviewed medical literature. Number one, taking them in reverse order, you need final approval to market from the appropriate government body. And you don't have an FDA approval, right? Yes. There's an FDA approval for this clinical trial. I thought only for the studies. Marketing? To market? This is not a medication. This is a procedure. I know what you're saying, but we're looking at an insurance policy. It has words in it. Yes. What I'm asking you is under number one, it says the procedure is experimental and investigational under the plan if, one, it has not received final approval to market from appropriate government bodies. And, Your Honor... Hold on a minute. Yeah. Does market apply to this kind of process as well as to drugs, or are you saying market only applies to drugs? No, no, I'm not saying that. Okay, so then you do have to get a final FDA approval to market this process? To market it in a wholesale fashion, yes. That doesn't say that. It just says market, right? It says to market, and there are many parts of the record below that speak to the market. Well, there are a lot of medical studies where it isn't marketed wholesale or retail because somebody funds the study, so the people who are getting the experimental treatment don't have to pay for it. The problem here for the doctor is he couldn't get any funding for his study, but still study. He has funding for his study. It's funding in a statistical manner, and he's treating people with no alternatives with a treatment that has a greater than 85% response rate with no mortalities. Mr. Hammond, I can appreciate very much why your client wanted to do this, but isn't the reality that almost every major medical school in the United States has lots of doctors who like people to participate in protocols? They're happy to have them do it, so they can put together the information necessary to get the approval from the FDA so they can, in fact, market these things. What he did was perfectly legal, perfectly ethical. He helped your client in some ways, but the reality is you're talking about whether a third-party company that insured your client, whether under the terms of its policy and governing law, is required to pay for what is clearly a protocol. It's an experiment. They say no. You say yes. Isn't that a fair analysis of that? Well, they say no, and I say yes, and if you would allow me, I would like to tell you why I say... Okay, please do. ...that this is not experimental and investigational and wasn't at the point at which this insurance company made this decision. You've talked a lot about informed consent. Well, informed consent was never considered by this insurance company. It is not a part of the five-part disjunctive definition. But in a matter of law, as a matter of law in a civil court, an admission against interest is considered, is it not, whether it's part of the plan or not. If she admitted, let's just say that it was worded differently, and she just said, I recognize that this is an experimental procedure, which is really what you did here, doesn't that have some bearing on how this comes out, where she acknowledges that it's experimental? I think it has none. None at all. Okay. Because these insurers made their evaluation and gave their denial based on their plan, and their plan instrument has these five parts that... Let me ask you about one of them. ...that are disjunctive, but... Let me ask you about one of the disjunctive parts. Okay. The one that says, it's one about which the peer-reviewed medical literature does not permit conclusions concerning its effect on health outcomes. Now, you submitted two articles. One was an illegible copy, so I'm ignoring it because I can't read it. The other one I can read, the gastroenterology article. A couple things jumped out at me. In the abstract, the authors write, a randomized study will be needed to confirm the efficacy of this therapy. And then at the beginning of the text, I learned that only 12 patients were reviewed for this particular article, an inadequate sample, of course, if you're trying to draw any statistically significant conclusions about anything. Then under study design, I read that it was a pilot study. Now, I know what pilot studies are. They don't confirm. All they do is determine whether further research might or might not be very desirable or a waste of time. Then I look at the ending, and what they say, although further longer follow-up is needed, further investigation of autologous HSCT for CD appears warranted. A randomized trial will be necessary to confirm these results. So the study itself says that it's a pilot study that does not confirm any results. A randomized study will be necessary to permit any conclusions concerning its effect on health outcomes, which is just what the plan says makes something experimental. Your Honor, if I can address that, and I have addressed that in my brief, but that is a single article that was six years old at the time, or thereabouts, at the time they made this decision. At the time they made the decision, the data from the blood article had over 20 patients and agreed it's small numbers, but the response rate was incredible. And this girl was not responding to other modes of therapy, and she looked to this clinical study, and if you look at her policy, it doesn't say that experimental and investigational includes clinical trials or informed consent or nonstandard therapy. It's a five-part definition, and Dr. Burt in his 200-some-odd-page deposition refuted each of those. I don't think you understood our questions about the consent form. It's not experimental or investigational, depending on whether there's a consent form or what the consent form says. The importance of the consent form is that it's a signed representation by the plaintiff that she knows that the procedure is experimental, which is evidence that it, in fact, is. Well, experimental is a term of art, and I argue that it's a term of art because of the way this insurance company defined it and because of the case histories that I gave in my briefing. My time is up, Your Honor. We've taken a lot of time. You may have something you wanted to state now. For instance, about the first one, Judge Smith said, the first one is you have to receive final approval to market from the appropriate government age bodies. I assume that's the FDA, is that right? Well, no, Your Honor, and I'm eager to explain that. If you look at the record below, in Dr. Burt's response originally to Dr. Koren's questions, there was like eight letters from insurers. Now, they have said those are irrelevant, but there's one of those letters that references what is known as the Medicare, and let me make sure I get this term correct, the Medicare Coverage Determination Manual. Now, Medicare is a federal agent, and they specify whether studies are covered by Medicare. This study qualified for those, and for that reason, patient number four at docket 1-5 in the record below shows that they approved it because it did meet the Medicare determination standards, and that's for market. I'm sorry, Your Honor. What does Medicare qualification have to do with a private insurance policy's coverage? It's a federal agent. I understand that. It's a governmental body. The question is, let's just say that Medicare just says, if you have a medical cost, we'll pay for it. Does that obligate every private insurance company to do the same? They're totally different. No, no, but it does meet the one limb that says final approval to market from appropriate governmental bodies. That doesn't give approval to market. It just says that Medicare will pay for it. Well, I think in a summary judgment situation where inferences should be drawn in the health care consumer's fashion, it certainly was felt to be governmentally approved by Dr. Burr. This is a legal document. It's a legal issue. Yes. It's not a fact, either an allegation or not, but the fact that Medicare approved it has absolutely nothing to do with this insurance policy, unless the insurance policy incorporates the Medicare standards into its policy, and I'm unaware that it has done so. No, it hasn't, but it does say governmental bodies. In Medicaid, Medicare have approved it, and at least in the eyes of Dr. Burr and in the eyes of this health care consumer, that's approval by governmental bodies. I have no doubt they feel that way. Okay. And the peer review, I've gone over that. It's a peer review in motion because this study is ongoing. It's terribly effective. Two peer-reviewed articles in the record, gastroenterology article and blood article. But there's a blood article. Blood article I can't read, so it's like it doesn't exist. Is there a legible copy in the record? Yes, there is, and I would be happy to mail that to you or send it by e-mail if the court would prefer. We don't want supplementation if it's in the record. Is it here? Is there a legible copy? Well, it's referenced in the record, but it was an online blood article. The numbers of patients Dr. Burr had. I want to read it for myself. Okay. I can e-mail it to you. If the presiding judge directs you to or we issue an order. Yeah, and I'm happy to do that. It's larger numbers, and the response is the same, and the reasons for abandoning the efforts at randomized trials is fully set out in that 200-page deposition that Mr. Murphy and I did with Dr. Burr. The third, alternative treatments, there were none. Positive outcomes have gone over with an 85% response rate and no mortalities. In an investigational and experimental setting, only, you know, this. No mortalities is luck. I mean, the way this works, you completely destroy the patient's immune system. The theory is the excessively active immune system is causing the inflammation in the gut, so you completely destroy the immune system, and then you revive it with the patient's own stem cells taken from, I assume, the new method of getting stem cells from marrow, the peripheral apheresis method, and then the patient gets a revived immune system, and hopefully when you reboot it, it doesn't have the excessive reaction. That's the theory, and it's a very attractive theory, but the doctor says in the consent form that there's a risk of death because if you catch a trivial disease when your immune system is destroyed, you die. With all due respect, Your Honor, most consent forms that doctors get are fraught with hazard, including death, and I don't think we can term this luck. This is a number of patients. One of the titles on the consent form says non-myeloablative stem cell recovery, and Dr. Burt goes into some detail in his deposition about how… I mean, it's apheresis, not poking a needle right into the joint or into the bone. No, this is all peripherally done, and it's non-myeloablative, which means Dr. Burt testified that these patients would recover. These are high doses, but they're not ablative doses, that they would recover and that the stem cells are used to shorten their hospitalization. It's very clear in his deposition. Your Honor, I could go on, and I don't want to… No, I think we have gone way over the time, so thank you very much. Yes, thank you. Good morning, Your Honors. I'm Andy Forsyth, and I represent the employer of the employee and the plan owner, Sisters of Charity of Leavenworth, which operates hospitals. Counsel, I don't know that this will affect any conclusions, but I was kind of impressed that it got to the stage of human testing. I didn't see anything about animal testing. Can animals get Crohn's disease? Was there animal testing? You know, in Dr. Burt's deposition… The FDA did approve it for human testing. Yes. In Dr. Burt's deposition, he describes a background in animal testing, although I believe he meant it more in general terms. You know, he came from dealing with various autoimmune diseases. You know, he talks about using this technique on multiple sclerosis, using it on the arthritic, my mind's blocking, there's a form of arthritis that's an autoimmune disease. And I believe what he was saying was there was animal testing on some animals that are able to present autoimmune conditions, although not necessarily Crohn's disease. Yeah. I did see that in his deposition. And, you know, certainly we all hope that this will be a fruitful treatment in the future. I guess you can thank this lady for paying for it, if it is. Yes. Yes, Your Honor. So my colleague here, representing the third-party administrator, Bernie Hubley, will share some of our time. I'll try to watch my clock carefully. Do we need any of those other issues that were raised in the briefs, or can we just go and should we just go to whether it's an experimental procedure? I thought there's this issue about whether ERISA even applies. There's the issue about whether you reviewed de novo or for abuse of discretion, whether the church exception applies, whether Kansas law applies, because I think there was something in the plan document that said apply Kansas law. And it looked to me like all interesting, difficult issues that we need not and therefore should not decide. Is that correct? I think those are all behind us, yeah. What do you mean behind us? It's not an ERISA plan. Do we need to decide them? No, no. So we don't have to say it's not an ERISA plan? No, no, not unless you want to explain why you're applying Montana law to a contract in the normal way, which is what I'm sure. But everybody agrees now on those other issues, and the only issue for us is whether it was experimental and investigational within the terms of the health plan. I believe the only issue for you is it's a contract to be interpreted according to Montana law. What if we interpret it according to Kansas law? Would it make a difference? I haven't looked at Kansas law. What about, well, funny, the plan said apply Kansas law, but we haven't looked at it. What if we apply the federal common law that's developed around ERISA? Any difference? You know, you do a different analysis. They can come to the same conclusion. The difference under ERISA would be there would be an issue of do you use a Let's say it's de novo review. If it's de novo, which it would be under Montana law. Okay, let's say it's abuse of discretion. Then what? Well, under abuse of discretion, I think that's a lighter standard on the plan. Yeah, I know it's a lighter standard, but how would it affect this case? I think the conclusion is the same. I think the de novo standard, the stricter standard, As I understand it, you and your opponent agree that the only issue we have is to determine what these provisions of the health plan are without any particularity of any law. Just look at these five provisions, look at the record, and see if it's experimental. I believe that's correct. And just to add this gloss to it, what I think I heard you say was whether it's Montana law, you're not sure about Kansas law, but a federal common law around this area. We're talking de novo review probably. That's the highest you're willing to have it go that way? Absolutely. Any of that because you feel that as a matter of law, this is an open and shut issue. Correct. Yeah, and I believe that it's not an ERISA plan. I don't think there is. I think it's de novo review. I do think Montana law applies. The employee lived in Montana. Nobody disagrees that we can apply Montana law, right? I believe Montana law. Okay. All right. You both agree on everything except whether these five conditions have been met. Correct. Yes. Our position is pretty simple. Any of these five has not been met. Yeah. Under the facts in the record, the plan was experimental as defined by that definition in the plan. And it's several elements in the alternative. I heard questions earlier. It's quite correct. If it fails, if the treatment fails under any of the alternative definitions of experimental, then it simply isn't covered. And based on the record, I mean no one likes to deny coverage, but based on the record. Oh, I know. I don't know about that. Wait a minute. A lot of lawyers have come up here. Where's my handkerchief? Oh, gosh. Well, you know, you don't have to deny coverage. We'll let you if you want. Good point. Fair point. What does the blood article say? You know, the blood article. You must have been able to read it. I can't read it. The blood article as I understand it. Wait. I don't want to know as you understand it. What does it say? I don't have the article. I believe it was referred to in Dr. Burt's deposition as about to be published. It was in the excerpts. It was just illegible. Okay. I was thinking of the other one. I don't. But you must have gotten yourself. I'm sure the insurance. When I represented insurance companies, they would actually pay if I billed them for getting a legible copy of an article from the library. So I'm sure you did it. I noticed it's not legible, and I'm embarrassed about that. It should have been. Yeah. Can you please, from the insurance company's perspective, pick out your best case of the five disjunctive disqualifiers under the policy? Sure. Experimental and investigational. Which one do you think is just an absolute dead-bang winner? No way the other side can countervail that one. And if you get that, then you win. Okay. Let me put them in order. Just pick one. Just one. I'm going to say the best, although not the only. No, I understand that. Is the last, which is one in which the improvement claim does not demonstrate it to be obtainable outside the experimental and investigational setting. And in this case, as I understand the evidence, there's no evidence that anything was ever done outside that setting. Is that correct? Correct.  His earlier article in 05 said, I've done 12 patients, and it said it looks promising, it's not harmful, we need to study further. His new article, he said in late 2010, about to be published, he had now done 26 patients. So now we're what, six years later, or five years later, he's done 26. He agrees, though, that still there has been no treatment outside the investigational university-type setting, and that there has been no differential testing. That is, there has been no testing that would take patients that don't get the treatment, patients that do, and comparing the difference. And that's what's lacking. So I think that's probably the best one. What does that mean, that it's not demonstrated to be obtainable outside the experimental and investigational setting? What does that mean? Somebody goes and wants to get this, and he says, yes, I'll give you the treatment. Yeah, and it means it isn't being offered as medical care available to ordinary folk from ordinary medical institutions. I mean, somebody goes, this lady goes to the doctor and says, here you've got this process, and I've got this terrible disease. Can you do something for me? And he says, yes. Is that outside the experimental and investigational setting, or is it inside? Under the facts of this case, in fact, it was inside, because Dr. Burt testified that his intention was to sign her up for the clinical trial. In the evidence is the actual National Health Institute report. Well, it doesn't matter what she did. It says here, on your point, point five, it's not demonstrated to be obtainable outside that setting. Did anybody else get this treatment where it wasn't within the experimental setting? The evidence in the record is that this treatment was only available at this and one or two other research-type university settings in the United States. Was any evidence, admittedly, if it's at various universities, you have the same situation, but was any evidence produced that indicated that anyone had obtained this treatment outside of a university experimental setting? No. Not in the United States, anyway. Well, it doesn't say United States. I'm not aware of any evidence that there was any treatment outside the university. Okay, so in the record, there's no evidence. Correct. Have they gotten to randomized trials yet where they assign people randomly in large enough numbers so that they'll get a statistically significant result? The latest article I'm aware of was the one I mentioned that was going to publication, and no, they had not at that point. We don't have a copy of an article that doesn't exist yet, right? Right. And it's not peer-reviewed if it hadn't been published yet. Right. What if there were doctors in Tijuana or Ensenada or something like that that were offering something like that? Under the terms of the policy, does your treatment, is it limited to treatments within the United States? No, but it is limited. I'm going to go beyond my choice provision now. Right. It's limited to treatments. The coverage is not available for treatments not recognized as conforming to generally accepted medical practice. Okay, so basically the universe does not rise and fall on this one paragraph. There's a generally accepted medical practice is another exception, right? It's all under the definition of experimental. Okay, so that's the part that – It's right in the opening paragraph. Okay. What page are you looking at on the – I actually was looking at the brief, but I can't find it. What I'm guessing is ER Volume 2, round page 40, something like that. Is that correct? I've got to look at my – I'm sorry. I've got the definition in front of me, but I don't have the page reference in the plan. It's not critical. Would you read the portion you're talking about? Sure. So the heading is experimental and investigational, and the paragraph says, surgical procedures or medical procedures, supplies, devices, or drugs, which at the time provided or sought to be provided, are in the judgment of BCBS not recognized as conforming to generally accepted medical practice. So there's a – the predicate there is in the judgment of the insurer. Yes. And what is that based upon, other than financial consideration? Well, I think in this case we're agreeing that the insurer or the decider is obliged to make a decision reasonable based on the fact. The decider was President Bush. How did he get in this? Yeah. So that's part of the – that's one of the prongs of the definition. It then goes in the alternative or, and then of course there's the list of the five other elements. But it also – one of the elements is not demonstrated to be an established alternative. It says alternative. I think it means alternative treatment. So under Montana law, which I think applies, insurance plans are interpreted as contracts, insurance plans normally interpreted by the court in Montana. And on the facts here, it's clear that this was experimental. And, you know, I have two minutes left, and I haven't given any time to Mr. Hubley, so if I may. Mr. Hubley? Here he comes. Brevity is the soul of wit and wisdom, and I will be brief. I concur with counsel that the probably strongest element is the fifth element. This just isn't available, and I think the key word is available outside the research and setting unit. Research and university setting. And I think if you look back, that's the basis upon which the administrator made this. I'm a little wary, frankly, of using that basis because there are so many medical procedures where the doctor refers you to some university medical facility, and there are so many medical procedures where doctors differ on whether it's a good idea or not. And you see these transitions going on all the time, like with right now magnetic treatment for depression, where it starts off at one university setting, then it's available in a lot of university settings. It seems to be beyond the experimental stage, but it's still only available in the universities. A lot of that just has to do with funding because universities often have more money than anyone else. I think the bottom line here, though, is that the availability of it was very, very small, only in the research setting, under the direction of the research institutional boards. How do you tell if something is a research setting as opposed to a treatment setting? I believe that the independent reviewer concluded that, and exactly his methodology. What do you mean, independent reviewer? There were two independent reviews done in this case, outside independent review. By whom? By the—the name is in the brief. I don't care about the name because it won't mean anything to me. What do you mean, independent review? Do you mean the insurance company asking a doctor for an independent review, or do you mean a government agency making an independent review? The insurer and the administrator asking for someone on the outside. You're saying—I get it now. Asking for an independent review. Now I understand what you mean. Yes, that's what I mean. The fact that the insurance company's doctor says this is experimental would not by itself be enough to persuade me it was experimental, but that seems to be what you're saying I should rely on. No, I think that obviously the administrator's doctor believed it was experimental, but he asked for an outside opinion on two separate occasions and got it, which came to the same conclusion. I bet they don't ask for a whole lot of outside opinions from doctors who tend to give outside opinions favorable to the insureds in close cases. Now you're thinking about the railroad case. I'm thinking about my independent medical examination cases in personal injury practice. Well, I think the— You're not going to have much work in this field. I think the point is, Judge, is that there are— let me take it from a different perspective. If you look at the plan, the patient here had the opportunity to ask the plan for coverage and to appeal the decision of a denial. That was done. Not only was that done, but if you look at the record here, it was done multiple times, which goes well beyond. Just tell us why—don't tell us what a great job you think the insurance company did. It just uses up time. Tell us how you determine whether something's an experimental or investigational setting and how you can show that this was, other than that the doctor hired by the insurance company says it was. Well, obviously independent review and the fifth element is what I just covered. Going through the other four elements, there is no approval for market. I mean, I think that's tried and true here, and it's hardly subject to debate. The second, there's no peer review article. Considering the disjunct of either one of those makes it experimental. Moving on to number three, it's not demonstrated as an established alternative. I mean, the consent form is overwhelming, saying that the only reason you're here basically is because there's— this is not an alternative. This is experimental. We're going to try something here that's not acceptable outside in the medical community. Moving on to number four, it's not demonstrated to improve health outcome. Your Honor, you yourself, I think, referred to the 12. That's just not enough. That's just not enough. What is the magic number? I can't tell you, but 12 doesn't seem to be enough. There was another article in the record, I think, that referred to 26. It may or may not have been the blood article, but even 26 to say that this is demonstrated to improve health outcomes, the evidence just isn't there. And then we move on to the fifth element where— Ordinarily, you do a randomized study, double blind, with people assigned to a placebo group and a treatment group, and it's a simple mathematical exercise to determine whether the difference in outcomes is statistically significant, which just means better than 0.05%. That's it. Correct. And I was kind of curious about whether that study had been done. As far as I can tell from the answers, it hasn't been. Not to my knowledge, and I see no evidence in the record of that. Let me conclude with this. What's bothersome about the argument to me is where the question started from. You have an admission here by the party themselves that this is an experimental procedure, and it seems like the whole exercise of this argument is you should ignore that, even if it's the truth. And I think that's not where we go here. It's going a little far because doctors do puff up those things in order to try to get themselves some protection from liability if things go wrong. It is, but— And patients are in a position where they are not able to negotiate. You go in there to have a doctor look at a fingernail, and he makes you sign something that says, oh, you may die from this, you may get brain injuries, you may get anything. So if you ever get anything, the doctor is protected. And I read those forms when I go to the doctor, and I go, my God, if I believed that. And you look at television ads for a drug, and they say, now take this drug, it's going to cure you. But on the other hand, be aware, and they go through every possible thing that can occur to you in life so that they're protected. I'm not as impressed as I might be by what the patient signs in order to get some treatment. But the bottom line with regard to the extent of the consequences, Your Honors, I think is very simply that this is an experimental procedure. The doctor, that's the message. This is an experimental procedure. The patient says, I acknowledge that, I understand. Regardless of the degree to which they describe the consequences, one fact remains. The message is, this is experimental. The acknowledgment is, this is experimental. I think that's the truth. I think that's what we should deal here. Under de novo review, that's dispositive. Thank you. Thank you, counsel. All right. I think we've used the time. We'll give you one minute if you want. No more than one minute, 60 seconds. These randomized trials are never going to be done. This is too effective a therapy, and nothing about randomized trials was ever in any of these policies. Incidentally, there are two policies that are referenced, and they're in the index. But consent forms that are outdated by years should not be used as current situations for a treatment that's gone on for 10 years and has been extremely successful. If we looked at consent forms for laparoscopic surgery, they would read very much like this, and insurance companies paid for them. If these insurance companies don't cover university settings or settings where there are clinical trials, why don't they just say so? And they don't. They set out a five-part schedule to define experimental and investigational, and the courts have seen that that ain't so easy to define. There is a line of cases in the Ninth Circuit and elsewhere that speak to the fact that these decisions don't always turn out in favor of insurance companies that are apparently delighted to pay for expensive procedures. I'll quit. Thank you, counsel. The case that's argued will be submitted. Final case for oral argument.
judges: Reinhardt, Kleinfeld, Smith